IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **COMFORT DTC, INC.,**<br><br>       Plaintiff,<br><br>   v.<br><br>**GRANT BAKER,**<br><br>       Defendant. | No.<br><br>JURY TRIAL DEMANDED |

## VERIFIED COMPLAINT

Plaintiff Comfort DTC, Inc., ("Plaintiff" or "Comfort DTC"), by and through its attorneys, Fox Rothschild LLP, brings these causes of action by way of Complaint against Defendant Grant Baker ("Defendant" or "Baker"), and in support thereof, avers as follows:

## PARTIES

1. Plaintiff, Comfort DTC, Inc., is a corporation with a principal place of business located at 175 N. Ada St., Suite 200, Chicago, Illinois 60607.

2. Defendant Grant Baker is an adult individual who resides at 38 Chatham Lane, Oak Brook, IL 60523.

## JURISDICTION AND VENUE

3. Jurisdiction is proper pursuant to 28 U.S.C. § 1331 because Plaintiff has asserted federal claims under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.* and violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.* The Court has supplemental jurisdiction over Plaintiff's additional state law claims pursuant to 28 U.S.C. § 1367 because Plaintiff's other claims are so related to Plaintiff's federal claims that they form the same case or controversy under Article III of the United States Constitution.

4. Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b) in that, *inter alia*, Plaintiff and Defendant do business in this jurisdiction, Defendant resides in this jurisdiction, and the events giving rise to this cause of action took place in this district.

## OPERATIVE FACTS

### Plaintiff and Defendant's Employment Relationship and Agreement

5. Plaintiff is in the business of engineering, designing, and selling complex bedding products, including but not limited to mattresses, sheets, and other sleep accessories.

6. Plaintiff hired Defendant as an employee in its information technology department.

7. In connection with Defendant's employment, the parties executed an Employee Non-Disclosure, Invention Assignment, and Non-Competition/Non-Solicitation Agreement (hereinafter, the "Agreement"), dated July 26, 2018. A true and correct copy of the Agreement is attached hereto as Exhibit "A".

8. Among the many provisions in the Agreement, Defendant agreed that, *inter alia*, all projects Defendant worked on in the course of Defendant's employment would remain the intellectual property of Plaintiff. *See* Ex. A at ¶¶ 6-7.

9. Additionally, Defendant agreed that he would not, during his employment and for a reasonable 24-month period thereafter, "directly or indirectly, engage in, represent in any way, be connected with, furnish consulting services to, be employed by, or have an interest, whether as owner, employee, employer, manager, promoter, principal, partner, servant, agent, representative, independent contractor, member, consultant, officer, director, or otherwise . . . in any business or entity that is engaged or primarily engaged in the Company's Business Activities." *See id.* at ¶ 4.

10. Defendant also agreed that he would return all company property in his possession to Plaintiff upon termination of his employment. *See id.* at ¶ 5 ("You understand that this obligation requires, among other things, that you return all . . . electronic and digital information, relating in any way to the business of the Company or its customers. This obligation also includes, but is not limited to, the return of all cell/smart phones, laptops, iPhones, BlackBerry or 'PDA'-like devices, or any other device that was provided to you by the Company.").

11. Further, the Agreement states that:

> You agree that, during your employment with the Company and for a period of twenty-four (24) months after the termination of your employment for any reason (including without limitation any termination for cause), you will not, without prior written authorization from the Company, directly or indirectly, for yourself or any third party: (i) solicit, encourage, or induce, or attempt to solicit, encourage, or induce, any employee of the Company to leave the Company's employ; or (ii) hire, solicit, recruit, induce, or encourage, or attempt to hire, solicit, recruit, induce, or encourage any individual, who at any time during the twenty-four (24) months preceding the termination of your employment was an employee of the Company, to become employed by or provide services to another business or entity that engages in the business activities included within the Company's Business Activities.

*Id.* at ¶ 3(a).

12. Notwithstanding his obligations to Plaintiff—based both in his fiduciary duties as an employee and his contractual agreement with the Plaintiff—on Thursday, November 29, 2018, Defendant sent an email to the chief executive officer of one of Plaintiff's known suppliers, Westpoint Home. A true and correct copy of the November 29, 2018 E-mail is attached hereto as Exhibit "B".

13. In a blatant effort to arrange a deal for himself, Defendant offered to "discuss how to drive traffic to bedding and home goods," referring to himself as having had success "advising

3

and managing UA for one of your more disruptive clients" and concluding that "we could both benefit from a more in depth phone call." Ex. B.

14. Upon information and belief, it appears that Defendant intended to improperly leverage Plaintiff's confidential proprietary information for a job opportunity that would allow him to cut Plaintiff out as Westpoint's distributor and market directly to Plaintiff's customers.

15. Alarmed by the obviously improper solicitation from Defendant, *Westpoint* immediately contacted Plaintiff and forwarded Defendant's email. *See id.*

16. Given that the clandestine offer of his services to one of Plaintiff's vendors was a clear and unambiguous violation of the non-compete clause in the Agreement, on Friday, November 30, 2018, Plaintiff terminated Defendant.

### Defendant Takes Plaintiff's Business Hostage

17. Immediately following his termination, Defendant, in no uncertain terms, took Plaintiff's business hostage.

18. As much as ninety percent (90%) of Plaintiff's revenue is generated through an application known as Facebook Business Manager.

19. Through this application—by which Plaintiff maintains a private account with limited access—Plaintiff retains a private customer list, manages its advertising platform, and processes orders/transactions with those same customers.

20. However, *after* his termination, and fully aware of the importance of the application to Plaintiff's business, Defendant changed the password for Plaintiff's Facebook Business Manager account, locking Plaintiff out of the application entirely, dismantling it, and threatening to take additional action on the company's Facebook page to hurt Plaintiff's goodwill and future business opportunities.

4

21. This act of sabotage ground Plaintiff's business to a halt as Plaintiff was unable to intake or process customer orders, market to customers, or even access its proprietary marketing platform.

22. Defendant's actions not only prevented Plaintiff from processing orders—thereby damaging any goodwill with those current or future customers—but Plaintiff lost approximately thirty thousand dollars ($30,000) in profit each and every day Defendant retained possession of the account.

23. As part of Defendant's "hostage" taking, he demanded that Plaintiff pay him a "severance package" in exchange for his releasing access to the application.

24. Defendant had no legal grounds to lock Plaintiff out; in emails to Plaintiff's counsel, Defendant suggested that the Plaintiff's Facebook Business Manager application is his *own* intellectual property, notwithstanding the clear terms in his Agreement to the contrary. *See, e.g.,* Ex. "A."

25. As part of the initial effort to stem the continuing and increasing damage to Plaintiff's business, on Sunday, December 2, 2018, counsel for Plaintiff gave Defendant a 5 o'clock pm deadline for the return of access to the Facebook Business Manager, and asked that Defendant permit access to the application for one of Plaintiff's employees, Shane Perrault ("Perrault").

26. Late in the evening on Sunday, December 2, 2018, Defendant indicated that he had provided Perrault access to the Facebook Business Manager account. However, Perrault (and, by extension, Plaintiff) did not have access and Defendant lied as he dragged out his scheme to exploit, extort, and/or dismantle Plaintiff's proprietary information.

5

27. Indeed, on the morning of December 3, 2018, Defendant sent one of Plaintiff's counsel an email that he indicated was evidence that he was no longer in possession of Plaintiff's Facebook Business Manager account. A true and correct copy of the December 3, 2018 email is attached hereto as Exhibit "C".

28. The email contained a screenshot from Facebook indicating that Defendant currently has access to three managed accounts. According to Defendant, it used to show that he had *four* account permissions; the implication is that the fourth, "removed" account is Plaintiff's. *See id.*

29. This was a brazen (and poorly constructed) lie. Defendant attempted to black out the names of the remaining three Business Manager accounts, but he failed to adequately do so and close inspection of the account in the upper right side of the screenshot shows that *it clearly says "DTC." See id.*

30. While Plaintiff reached out to Facebook directly to resolve the issue, Plaintiff's employees were informed that it could take weeks to resolve the issue through the service provider.

## Last Ditch Efforts To Amicably Resolve Dispute

31. Based upon his obfuscations and misrepresentations, Plaintiff immediately began preparing the foregoing Complaint and an accompanying emergency motion seeking entry of a temporary restraining order and preliminary injunction against the Defendant.

32. At 6:10 pm EST, on Tuesday, December 4, 2018, counsel for Plaintiff emailed Defendant a copy of the Complaint and accompanying Motion, and again asked that he relinquish control of Plaintiff's proprietary business platform.

6

33. Defendant responded that the Facebook Business Manager was no longer in his possession, as he relinquished it on Sunday evening.

34. Following this email, Defendant sent another email to Plaintiff's counsel, stating, "Patience is wearing thin here. He can request access to both of those accounts via Facebook. [sic] support should be able to do this for him. Please confirm that this is the case."

35. Thereafter, without admitting that he had full control and despite his protestations to the contrary, Defendant granted Perrault the lowest possible access and privileges to view the application in question.

36. While Perrault was only able to view the application, given his restricted access, he determined, *inter alia*, that Defendant was still the administrator of the application and had been actively transferring and/or deleting content that Plaintiff had invested significant sums of money to develop.

37. The deleted content includes advertising accounts, fan pages, and Facebook Pixels, which hold the data necessary to rebuild Plaintiff's client list and reinitiate its marketing strategy.

38. Specifically, a Facebook "Pixel" is a code placed upon advertisements that collects data, allowing the owner of the Pixel (*i.e.*, Plaintiff) to build target audiences for future advertisements and to re-market to individuals that have already viewed and/or clicked on past ads.

39. Plaintiff has invested substantial capital in building these Pixels, and would have to spend an inordinate amount of time and additional money to rebuild their advertising campaigns from the ground floor.

7

40. Conversely, these Pixels would be highly valuable to a competitor and Plaintiff fears that Defendant will or already has misappropriated these trade secrets for his own personal benefit and/or the benefit of a heretofore unknown third party.

41. When confronted by Plaintiff's counsel about the limited access and the deletion of content, Plaintiff responded by email at 10:08 pm EST, in relevant part:

> The way I see it 3 options.
>
> 1) everybody walks away
>
> 2) your client settles with me for outstanding wages and commissions in exchange for full access
>
> 3) I restore access, then sue your client for nonpayment of wages and wrongful termination, and potentially have regulators get involved
>
> If I don't hear a response by midnight EST tonight, I will assume it to be option 3 and will take appropriate action.

42. After it was pointed out to Plaintiff that he just admitted, in writing, that he in fact lied and retained control of the Facebook Business Manager despite his representations to the contrary, Defendant finally granted Perrault administrative access to the account approximately ten minutes later.

43. It was thereafter discovered that access to all of Plaintiff's Facebook fan pages—critical aspects of Plaintiff's marketing campaign strategy—were missing.

44. While Defendant later claimed in an email—and subsequent text message—that "the Fan Pages don't exist anymore," both pages—at the time—were active and under Defendant's control. *See, e.g.,* https://www.facebook.com/HypeSugarCom/ (last visited on December 5, 2018); https://www.facebook.com/limitlesstechblog/ (last visited on December 5, 2018).

45. Upon information and belief, Plaintiff believes that a forensic analysis of Defendant's computer will demonstrate that he actively deleted these pages and other content from the account.

46. Plaintiff is assessing the damage and working with Facebook to recover as much of the data as possible.

47. Unfortunately, even after regaining access to the Facebook Business Manager account, it took days for Plaintiff to repair what it could and make the account functional.

48. As of the time of this filing, Plaintiff is still in the process of reinitiating its marketing campaigns.

49. Plaintiff has lost over three hundred thousand dollars ($300,000.00) of gross profit as a direct and proximate result of Defendant's illegal actions so far and continues to suffer comparable damages until the Facebook Business Manager account is fully restored.

50. Moreover, because Defendant admittedly had sole access to this proprietary and confidential information for a number of days, there is a substantial risk that this information will be exploited by Defendant to Plaintiff's detriment.

**Defendant Continues To Violate the Agreement And Harass Plaintiff's Employees**

51. Having finally surrendered access to Plaintiff's Facebook Business Manager account, Defendant has resorted to a campaign of sending harassing messages to Plaintiff's employees.

52. For example, during the course of Defendant's e-mail exchange with Plaintiff's counsel on December 4, 2018, it appears that Defendant began sending harassing messages to Plaintiff's employees through the company's website.

53. Around that same time, Defendant sent a string of threatening text messages to Perrault and Plaintiff's Chief Marketing Officer, Ray Lyle.

54. Fearing for its employees' safety, Plaintiff was forced to file a formal police report to address the increasingly bizarre messages sent by Defendant.

55. Unsurprisingly, while making threats to some of Plaintiff's employees, Defendant has also brazenly sought to recruit others in blatant violation of the non-solicitation provisions in the Agreement. *See* Exhibit "A" at ¶ 3(a).

56. Such conduct is in clear violation of the unambiguous language of the parties' Agreement and, if nothing else, only further underscores Defendant's utter disregard for the law and his own contractual obligations.

57. Curiously, as part of this apparent recruitment effort, Defendant provided some of Plaintiff's employees access to an online database outlining his various marketing campaigns and revenue generation.

58. Upon information and belief, it appears that Defendant has been utilizing Plaintiff's proprietary marketing data and Facebook Business Manager account to advertise for other companies.

59. In fact, this improper use of the account caused Facebook to temporarily freeze advertising activity on the Facebook Business Manager as it violated the platform's advertising policies.

60. Moreover, Plaintiff has also discovered that, in addition to stealing Plaintiff's proprietary data, Defendant has also stolen money.

10

61. Specifically, while employed by Plaintiff, Defendant had access to a company credit card that was ***only*** to be used to pay for marketing expenses related to the Facebook Business Manager account.

62. Nevertheless, it appears that—immediately before attempting to leverage Plaintiff's proprietary data for an employment position with one of Plaintiff's suppliers—Defendant made $4,176.78 worth of unauthorized charges on the company card.

63. Such charges include, *inter alia*, purchases made at Soldier Field on November 18, 2018 and charges from various restaurants around Chicago.

## COUNT I
## PLAINTIFF v. DEFENDANT
## BREACH OF CONTRACT

64. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

65. Defendant and Plaintiff are parties to a valid and enforceable Employee Non-Disclosure, Invention Assignment, and Non-Competition/Non-Solicitation Agreement. *See generally* Ex. A.

66. The Agreement precludes Defendant from, *inter alia*: (1) soliciting, or participating in the solicitation of, Plaintiff's current or former employees and/or its customers; (2) diverting or exploiting Plaintiff's business opportunities; (3) using or disclosing Plaintiff's confidential or proprietary information to benefit anyone but Plaintiff; (4) retaining Plaintiff's intellectual property or proprietary information; or (5) otherwise unlawfully competing with Plaintiff.

67. By virtue of the foregoing actual and threatened conduct, Defendant has knowingly and willfully breached his Agreement with Plaintiff and, as a direct and proximate

cause of Defendant's knowing and willful breach of contract, Plaintiff has and will continue to suffer great economic injury and loss.

68. The above-described actual and/or threatened conduct is the direct and proximate cause of immediate and irreparable harm to Plaintiff.

69. The Defendant's actual and/or threatened actions will continue to cause Plaintiff irreparable harm if not enjoined.

70. These breaches were intentional, willful and material and Defendant's actions were willful, wanton and outrageous thereby justifying the award of punitive damages.

**WHEREFORE**, Plaintiff Comfort DTC, Inc., demands judgment be entered in its favor and against Defendant Grant Baker for relief as set forth below.

## COUNT II
## PLAINTIFF v. DEFENDANT
## CONVERSION

71. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

72. As set forth above, Plaintiff manages the majority of its business through its proprietary platform account on Facebook Business Manager.

73. As the owner of this account, Plaintiff has an irrefutable right to immediately possess and/or access the account—and the proprietary information stored therein.

74. Nevertheless, after being terminated by Plaintiff, Defendant improperly accessed Plaintiff's Facebook Business Manager account and intentionally changed the password to deny Plaintiff access to the same.

75. Plaintiff has demanded the return of the account, but Defendant refused for a number of days and only a threat of this lawsuit eventually compelled his cooperation.

76. However, upon information and belief, he still possesses missing and/or deleted content that he improperly obtained.

77. While Plaintiff has demanded the return of this content, Defendant has refused to do so.

78. To date, Defendant's unlawful conduct caused Plaintiff to lose approximately three hundred thousand dollars ($300,000.00) of gross profit, and Plaintiff continues to incur significant damage each day it is forced to spend repairing Defendant's dismantling of the account.

79. Additionally, Plaintiff's investigation has revealed that Defendant has converted at least $4,176.78 by way of unauthorized purchases on his company credit card.

80. This is money that Plaintiff has an irrefutable right to and was specifically earmarked for Plaintiff's advertising campaign, but Defendant intentionally stole for his own personal use.

81. Plaintiff is entitled to the return of these funds.

**WHEREFORE**, Plaintiff Comfort DTC, Inc., demands judgment be entered in its favor and against Defendant Grant Baker for relief as set forth below.

## COUNT III
## PLAINTIFF v. DEFENDANT
## MISAPPROPRIATION OF TRADE SECRETS IN VIOLATION OF THE DEFEND TRADE SECRETS ACT OF 2016 (18 U.S.C. § 1836 *et seq.*)

82. Plaintiff incorporates by reference the preceding Paragraphs of this Complaint as if set forth at length herein.

83. While employed by Plaintiff, Defendant obtained access to Plaintiff's confidential trade secret information.

84. The trade secret information retained by Defendant, such as its Facebook Pixels and confidential advertising data is related to Plaintiff's commercial retail services that are used in or intended for use in interstate commerce. As stated above, Plaintiff markets and sells products throughout the United States and the customer/prospective customer information obtained by Defendant relates to a substantial number of these services and/or confidential advertisement strategies for the promotion of the same.

85. Indeed, as expressly acknowledged in the Agreement, Plaintiff considers this type of information to be confidential and proprietary, and it has taken reasonable steps as part of its ongoing standard operating procedures to maintain the confidential nature of this information.

86. Upon information and belief, Defendant has utilized and is continuing to utilize Plaintiff's confidential, proprietary, and trade secret information to remove or divert business to a competitor—as seen by Defendant's attempt to do so on November 29, 2018. In doing so—or threating to do so—Defendant is maliciously and willfully using misappropriated confidential, proprietary, and trade secret information to his own advantage in direct competition with Plaintiff.

87. As a direct and proximate result of Defendant's violation of the Defend Trade Secrets Act of 2016, Plaintiff has sustained irreparable harm and damages in an incalculable amount that Plaintiff will attempt to establish.

88. The above-described actual and/or threatened conduct of Defendant is the direct and proximate cause of immediate and irreparable harm to Plaintiff, and will continue to cause such harm if not enjoined.

**WHEREFORE**, Plaintiff Comfort DTC, Inc., demands judgment be entered in its favor and against Defendant Grant Baker for relief as set forth below.

## COUNT IV
## PLAINTIFF v. DEFENDANT
## <u>VIOLATION OF THE ILLINOIS TRADE SECRETS ACT (765 ILCS 1065/3(a))</u>.

89. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

90. At all material times, Defendant knew, or should have known, that Plaintiff's confidential and proprietary information is deserving of trade secret protection under the Illinois Trade Secrets Act, in as much as:

    (a) Plaintiff invested substantial resources to create, develop, compile, and maintain this information;

    (b) The information is not known outside of Plaintiff's business—and, even within, only by those with access to the Facebook Business Manager account;

    (c) Plaintiff requires employees with access to such information to execute confidentiality agreements and other restrictive covenants as a precaution to safeguard the confidentiality of the information;

    (d) The information cannot be replicated, compiled, or recreated by a competitor without substantial time, effort, and expense.

91. Defendant only had authorized access to Plaintiff's proprietary information while he was in a position of trust and confidence and under circumstances that make it inequitable and unjust for him to have misappropriated the materials and to be using them for his own gain.

92. By unlawfully taking, using, and/or disclosing Plaintiff's confidential and proprietary information, Defendant has misappropriated Plaintiff's trade secrets in violation of the Illinois Trade Secrets Act.

93. The above-described actual and/or threatened conduct of Defendant is the direct and proximate cause of immediate and irreparable harm to Plaintiff, and will continue to cause such harm if not enjoined.

**WHEREFORE**, Plaintiff Comfort DTC, Inc., demands judgment be entered in its favor and against Defendant Grant Baker for relief as set forth below.

### COUNT V
### PLAINTIFF v. DEFENDANT
### VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030 *et seq.*)

94. Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

95. The Computer Fraud and Abuse Act ("CFAA") makes it unlawful for any person to intentionally access certain computers without authorization, or to exceed authorized access, and thereby to obtain information from any protected computer.

96. A protected computer is defined in the CFAA as one used in or affecting interstate commerce or communication.

97. Plaintiff's Facebook Business Manager account qualifies as a computer system as defined by the CFAA insofar as it is used extensively to market and/or process sales orders across state lines.

98. Defendant, who upon termination was not authorized to access Plaintiff's Facebook Business Manager account, nevertheless accessed the account and locked Defendant out of the same.

99. Upon information and belief, Defendant has downloaded, e-mailed, copied, or printed information from the system that was protected by the CFAA.

100. Moreover, while in sole and unauthorized control, Defendant deleted and/or transferred valuable content and proprietary data from the platform, thereby causing damage to the same.

101. Without access to the system, and as a result of Defendant's destruction of same, Plaintiff has suffered, and continues to suffer, a loss of at least in excess of the $5,000.00 statutory requirement.

102. The CFAA provides that any person who suffers damage or loss because of a violation of the CFAA may maintain a civil action for compensatory damages, injunctive relief, and/or other equitable relief.

103. Defendant's actions in unlawfully accessing Plaintiff's computer system without authorization, taking the system hostage, and deleting/transferring the information therein was willful, wanton, and malicious.

104. To date, Defendant's unlawful conduct caused Plaintiff to lose approximately three hundred thousand dollars ($300,000.00) of gross profit, and Plaintiff continues to incur damage each day it is forced to spend repairing Defendant's dismantling of the account.

105. The above-described actual and/or threatened conduct of Defendant is the direct and proximate cause of immediate and irreparable harm to Plaintiff, and will continue to cause such harm if not enjoined.

**WHEREFORE**, Plaintiff Comfort DTC, Inc., demands judgment be entered in its favor and against Defendant Grant Baker for relief as set forth below.

### RELIEF REQUESTED

106. By reason of the aforesaid, Plaintiff seeks the following:

   (a) An injunction ordering Defendant to

   (i) immediately return any and all property in his possession, per the terms of his Agreement, to Plaintiff's counsel;

   (ii) cease using or accessing any of Plaintiff's data and property, including its proprietary business platforms;

      (iii) to comply with the terms of the restrictive covenants contained in his Agreement, including but not limited to his duties of confidentiality, non-competition, and non-solicitation; and

      (iv) cease contacting, either electronically or otherwise, Plaintiff or any of Plaintiff's employees.

  (b) An award of compensatory damages in excess of $300,000, in an amount to be determined;

  (c) Statutory damages under the DTSA, CFAA and/or ITSA, in an amount to be determined;

  (d) An award of reasonable counsel fees and costs, in an amount to be determined;

  (e) Costs, and pre-judgment interest as permitted by law; and

  (f) Such other relief as may be deemed just and equitable.

      Respectfully submitted,

      **FOX ROTHSCHILD LLP**

      */s/ Marc C. Smith*
      Marc C. Smith (6189574)
      Colin D. Dougherty (6326337)
      353 N. Clark St.
      Suite 3650
      Chicago, IL 20005
      (312) 517-9200 – Telephone
      (312) 517-9201 – Fax
      mcsmith@foxrothschild.com
      cdougherty@foxrothschild.com

Dated: December 19, 2018

## VERIFICATION

I, Raymond Lyle, being of full age, hereby certify that I am the Co-Founder and Chief Marketing Officer of Comfort DTC, Inc., the Plaintiff in the foregoing Complaint. As a result, I have personal knowledge of all of the events alleged herein. I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

*[signature: Raymond M Lyle]*

Dated: December 18, 2018

ACTIVE\81656061.v1-12/12/18